# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF WISCONSIN

---

In re:

| | |
|---|---|
| CIB MARINE BANCSHARES, INC., | Case No. 09-33318-JES |
| Debtor in Possession. | Chapter 11 |

---

## DEBTOR'S MOTION FOR ENTRY OF ORDER AUTHORIZING THE RETENTION AND COMPENSATION OF CERTAIN PROFESSIONALS UTILIZED IN THE ORDINARY COURSE OF BUSINESS

---

CIB Marine Bancshares, Inc., debtor and debtor-in-possession (the "Debtor"), by its proposed attorneys, Godfrey & Kahn, S.C., submits this *Debtor's Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (the "Motion") seeking entry of an order in the form attached hereto as **Exhibit A**, authorizing the Debtor to retain and compensate certain professionals utilized in the ordinary course of the Debtor's business. In support of this Motion, the Debtor states as follows:

### JURISDICTION

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

Drafted by:
Timothy F. Nixon
Carla O. Andres
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Tel: (414) 273-3500
Fax: (414) 273-5198
E-mail: tnixon@gklaw.com
candres@gklaw.com

3. The statutory bases for the relief sought herein are §§ 105(a), 327, 328, 330 and 1107(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2014, 2016 and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

4. On the date hereof (the "Petition Date"), the Debtor commenced a voluntary case (the "Chapter 11 Case") under chapter 11 of the Bankruptcy Code with this Court. The Debtor is authorized to continue to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

6. The Debtor is a Wisconsin corporation registered as a bank holding company under the Bank Holding Company Act of 1956 and headquartered at N27 W24025 Paul Court, Pewaukee, Wisconsin. the Debtor is not a bank, but the Debtor's principal subsidiary is CIBM Bank, an FDIC-insured commercial bank chartered under the laws of the State of Illinois, which is wholly owned by Debtor.

7. The Debtor has prepared a Plan of Reorganization and Disclosure Statement pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") and has solicited acceptance of the Plan from that class of claims entitled to vote on the Plan. This Chapter 11 Case is filed as a pre-packaged plan of reorganization.

## HISTORICAL DETAIL

8. In June 2009, Marine Bank (the Debtor's wholly owned banking subsidiary) merged with and into Central Illinois Bank (the Debtor's other wholly owned banking subsidiary), with Central Illinois Bank being the surviving entity and adopting the name

2

"CIBM Bank." CIBM Bank owns and operates two nonbank subsidiaries, CIB Real Estate Holdings, LLC and Marine Investment Corporation. CIBM Bank (under its current and former names) together with the former Marine Bank of Wauwatosa, Wisconsin, Marine Bank FSB of Scottsdale, Arizona, and CIB Bank of Indianapolis, Indiana (all now merged into what is CIBM Bank), and together with Citrus Bank, N.A. and CIB Bank, both of which were formerly owned by the Debtor, are hereinafter collectively referred to as the "Subsidiary Banks."

9. The Debtor has five additional wholly owned nonbanking subsidiaries: (i) First Ozaukee Capital Corp. (which, in turn, was the parent corporation of Marine Bank); (ii) CIB Marine Information Services, Inc., (iii) Mortgage Services, Inc.; (iv) CIB Marine Capital, LLC; and (v) CIB Construction, LLC. As of the Petition Date, all but CIB Information Services, Inc. have ceased operations and are in the process of winding down.

10. The Debtor is also the sole owner of all of the common securities of four statutory or business trusts – CIB Marine Capital Trust I, CIB Statutory Trust III, CIB Statutory Trust IV and CIB Statutory Trust V (the "Statutory Trusts").

11. The Debtor and the Subsidiary Banks experienced a period of rapid growth and expansion between late 1999 through 2002. As part of its capital maintenance, between March 2000 and September 2002, the Debtor raised an aggregate of $60 million in capital through the issuance by the Statutory Trusts of four series of Trust Preferred Securities ("TruPS").

12. The source of funds for the payment by each Statutory Trust of distributions on the TruPS issued by it are principal and interest payments on a series of debentures in identical amount issued by the Debtor to such Statutory Trust (the "Debentures"). Although the Debentures are considered "capital" for bank regulatory purposes, they are classified as long-term indebtedness on the Debtor's balance sheet.

3

13. Under the terms of the indentures pursuant to which the Debentures were issued (the "Indentures"), the Debtor is entitled to defer interest payments thereon for a maximum five-year period, with all deferred interest coming due in full at the end of such deferral period.

14. During the Debtor's period of rapid growth and expansion from 1999 through 2002 a number of large loans were booked by the Subsidiary Banks, some of the loans subsequently became non-performing.

15. During 2003 and 2004, due to a significant deterioration in the credit quality of the Subsidiary Banks' loan portfolios and other credit-related matters, the Debtor shifted its strategic focus from business development and asset growth to improving the Subsidiary Banks' credit administration function, asset quality and liquidity and capital positions.

16. Examinations of CIB Bank (the Debtor's Illinois bank subsidiary at the time) by the Illinois Department of Financial and Professional Regulation, Division of Banks and Real Estate ("IDBRE") and the FDIC conducted during 2002 and 2003 identified severe deterioration in the credit quality of CIB Bank's loan portfolio, heightened credit concentration risk, and weakness in the credit administration process. As a result, in January 2003, CIB Bank entered into a Memorandum of Understanding ("MOU") with the IDBRE and the FDIC. Pursuant to the MOU, CIB Bank agreed to suspend the declaration or payment of dividends to its parent, the Debtor, without regulatory approval.

17. The Debtor experienced deterioration in the credit quality of its Subsidiary Banks' loan portfolios throughout 2003, including a significant increase in nonperforming assets. Regulatory examinations of CIB Bank and certain of the Subsidiary Banks in the Fall of 2003 revealed serious asset quality and credit administration concerns that caused the regulators to

pursue formal enforcement actions against two of the Subsidiary Banks, all of which became effective in May 2004 but which were subsequently lifted.

18. In addition to the foregoing, in 2004, the Debtor entered into a Written Agreement with the Federal Reserve Bank of Chicago (the "Reserve Bank Agreement") which, among other items, requires the Debtor to obtain Reserve Bank approval to pay interest on the Debentures. The Reserve Bank Agreement remains in effect as of the Petition Date.

19. As a result of the Reserve Bank Agreement, in the first quarter of 2004, the Debtor elected to begin deferring interest payments on all four series of Debentures as permitted under the terms of the respective Indentures, and, consequently, distributions on the TruPS were also deferred for such period.

20. The Debtor has sustained significant operating losses in each of the six fiscal years from 2003 through 2008 and the first two quarters of 2009 due in large part to credit losses, as well as to Debtor's continued accrual of deferred interest on the Debentures aggregating in excess of $2 million per fiscal quarter and totaling approximately $43.5 million dollars at June 30, 2009.

21. During 2004 and 2005, the Debtor became a defendant in two lawsuits brought by former shareholders that were ultimately settled in August 2008. The general terms of the settlement involved the payment by the Debtor of approximately $3.4 million, together with an additional amount paid by the Debtor's insurer, inclusive of costs and the Debtor's agreement to certification of a plaintiff class and obtaining class approval.

22. The Debtor deferred interest payments on the Debentures for the maximum five year deferral period permitted under the Indentures such that all accrued and unpaid interest, then

5

aggregating approximately $41.3 million at March 31, 2009, came due and payable in full during the first quarter of 2009.

23. Debtor lacked sufficient cash with which to pay the accrued and unpaid interest on the Debentures in full and, as a result, defaulted under the terms of the Indentures. As a result of such default, the Statutory Trusts are entitled, at the direction of the holder of the TruPS, to accelerate the indebtedness on the Debentures which, as of June 30, 2009, aggregated approximately $105.3 million, including approximately $43.5 million of accrued unpaid interest and approximately $61.9 million of principal.

24. The Debtor has sought the protections of the Bankruptcy Court as it negotiates with its creditors to restructure the obligations associated with the TruPS and the related Debentures or, in the alternative should such efforts prove unsuccessful, to evaluate its assets for purposes of ultimate distribution to its creditors.

## THE ORDINARY COURSE PROFESSIONALS

25. The Debtor retains various attorneys, accountants, and other professionals in the ordinary course of its business (each, an "OCP," and collectively, the "OCPs"). The OCPs provide services for the Debtor in a variety of matters unrelated to the Chapter 11 Case, including, but not limited to, legal services with regard to specialized areas of litigation, corporate law, and accounting services, including auditing and tax services.

## RELIEF REQUESTED

26. The Debtor seeks an order, pursuant to Bankruptcy Code §§ 105(a), 327, 328, 330 and 1107(b), to continue, in its sole discretion, to retain and compensate the OCPs listed on **Exhibit B** attached hereto.

6

27. The Debtor seeks permission to continue to employ the OCPs postpetition without the need for each OCP to file formal applications for retention and compensation pursuant to Bankruptcy Code §§ 327, 328 and 330. Due to the number of OCPs that are regularly retained by the Debtor, it would be unwieldy and burdensome to both the Debtor and this Court to request each such OCP to apply separately for approval of its employment and compensation. Additionally, the Debtor does not believe that Bankruptcy Code § 327 requires such approval, but out of an abundance of caution, the Debtor requests the relief sought herein.

28. The Debtor requests that it be permitted to employ the OCPs, effective as of the Petition Date, on terms substantially similar to those in effect prior to the Petition Date and in accordance with the procedures for retention and compensation of OCPs, as reflected on **Exhibit A-1** annexed to **Exhibit A** attached hereto (collectively, the "OCP Procedures").

29. Additionally, the Debtor seeks to reserve the right to retain additional OCPs from time to time during this case by (a) including such OCPs on a supplemental version of **Exhibit B** attached hereto that is filed with the Court and served on the Notice Parties (as defined below) and (b) having such OCPs comply with the OCP Procedures.[1]

## BASIS FOR RELIEF

30. The Debtor submits that the continued retention and compensation of the OCPs is in the best interests of the estate, creditors, and other parties-in-interest. While some OCPs may wish to continue to represent the Debtor on an ongoing basis, others may be unwilling to do so if the Debtor cannot pay them on a regular basis. Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtor and its operations, the Debtor

---

[1] Except as authorized by the Court, the OCP Procedures shall not apply to professionals retained by the Debtor pursuant to separate orders of the Court.

7

undoubtedly would incur additional and unnecessary expenses in educating replacement professionals about the Debtor's business and financial operations.

33. Moreover, the Debtor's estate and creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtor's business.

32. Additionally, in light of the number of OCPs and the significant costs associated with the preparation of retention applications for professionals who will receive relatively modest fees, the Debtor submits that it would be impractical, inefficient, and extremely costly for the Debtor and its legal advisors to prepare and submit individual applications and proposed retention orders for each OCP. Likewise, the procedure outlined above will relieve the Court and the U.S. Trustee of the burden of reviewing numerous fee applications involving relatively small amounts of fees and expenses.

33. The Debtor proposes to retain each OCP and pay such OCP, without formal application of the Court by any OCP, 100% of fees and disbursements after such OCP (a) files with the Court a declaration of disinterestedness that is served upon: (i) the Debtor; (ii) the Debtor's counsel or proposed counsel; (iii) the U.S. Trustee; (iv) counsel to any official committee appointed in the Chapter 11 Case; and (v) any other party who requests notice of such filings (collectively, the "Notice Parties"); and (b) submits to the Debtor an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date, provided that each OCP's fees, excluding costs and disbursements, do not exceed $50,000.00 per month on average over a rolling three-month period while the Chapter 11 Case is pending (the "OCP Cap").

8

Case 09-33318-jes    Doc 12    Filed 09/16/09    Page 8 of 13

34. Any payments to an OCP in excess of the OCP Cap shall be subject to prior approval of the Court in accordance with Bankruptcy Code §§ 330 and 331, the Federal Rules of Bankruptcy Procedure, the Local Rules of the Bankruptcy Court for the Eastern District of Wisconsin, the Fee Guidelines promulgated by the Executive Office of the U.S. Trustee, and any applicable orders of the Court. The Debtor submits that this process, set forth in detail in **Exhibit A-1** to **Exhibit A**, is necessary to avoid any disruption in the professional services that are required for the day-to-day operation of the Debtor's business while ensuring that the fees and expenses for the OCPs are effectively monitored.

35. All of these justifications are especially relevant in the context of the Chapter 11 Case as the Debtor has a fully developed reorganization plan that it seeks to confirm and effectuate promptly to exit bankruptcy expeditiously. While the Debtor fully intends to exit bankruptcy rapidly, and, therefore, the protocol set forth in this Motion, including the three-month rolling period, may become irrelevant, the Debtor is seeking approval of such a protocol out of an abundance of caution.

36. In determining whether an entity is a "professional" within the meaning of Bankruptcy Code § 327 and, therefore, must be retained by express approval of the court, courts consider the following:

    a. whether the entity controls, manages, administers, invests, purchases, or sells assets that are significant to the debtor's reorganization;

    b. whether the entity is involved in negotiating the terms of a plan of reorganization;

    c. whether the entity is directly related to the type of work carried out by the debtor or to the routine maintenance of the debtor's business operations;

    d. whether the entity is given discretion or autonomy to exercise his or her own professional judgment in some part of the administration of the debtor's estate;

> e. the extent of the entity's involvement in the administration of the debtor's estate; and
>
> f. whether the entity's services involve some degree of special knowledge or skill, such that it can be considered a "professional" within the ordinary meaning of the term.

*See, e.g., In re ACandS, Inc.,* 297 B.R. 395, 402 (Bankr. D. Del. 2003) (citing *In re First Merchs. Acceptance Corp.*, 1997 WL 873551 (D. Del. Dec. 15, 1997)); *In re Park Terrace Townhouses*, 852 F.2d 1019 (7th Cir. 1988) (recognizing that property manager/maintenance supervisor could be retained or replaced in the ordinary course of business without prior court approval); *In re Century Inv. Fund VII Ltd. Partnership*, 96 B.R. 884, 895 (Bankr. E.D. Wis. 1989) ("Ordinarily, payment of an agent managing the property under the direction of the owner would be made in the ordinary course of business without court approval."); *In re Riker Indus., Inc.*, 122 B.R. 964, 973 (Bankr. N.D. Ohio 1990) (not requiring § 327 approval of the fees of a management and consulting firm that performed only "routine administrative functions" and whose "services were not central to (the) bankruptcy case"); *In re Fretheim*, 102 B.R. 298, 299 (Bankr. D. Conn. 1989) (only those professionals involved in the actual reorganization effort, rather than debtor's ongoing business, require approval under § 327); *In re Johns-Manvile Corp.*, 60 B.R. 612, 619 (Ban. S.D.N.Y. 1986) (only those professionals involved in the actual reorganization effort, rather than debtor's ongoing business, require approval under § 327); *see also That's Entm't*, 168 B.R. at 230 (N.D. Cal. 1994) (only the retention of professionals whose duties are central to the administration of the estate require prior court approval under § 327).

37. The foregoing factors must be considered in totality (*i.e.*, none of the factors alone is dispositive). Considering all of the factors, the Debtor does not believe that the OCPs are "professionals" within the meaning of Bankruptcy Code § 327, whose retention must be approved by the Court. *See id.* Specifically, the OCPs will not be involved in the administration

10

of the Chapter 11 Case; rather they will provide services in connection with the Debtor's ongoing business operations, which services are ordinarily provided by non-bankruptcy professionals.

38. Nevertheless, out of an abundance of caution, the Debtor seeks the relief requested herein to establish clear mechanisms for retention and payment of the OCPs and thereby avoid any subsequent controversy with respect thereto.

39. Courts in various districts have routinely granted the same or similar relief to chapter 11 debtors in other large chapter 11 cases. *See id. See also In re Masonite Corporation*, Case No. 09-10844 (PJW) (Bankr. D. Del. Apr. 14, 2009); *In re Muzak Holdings LLC*, Case No. 09-10422 (KJC) (Bankr. D. Del. March 12, 2009); *In re Vertis Holdings, Inc.*, Case No. 08-11460 (CSS) (Bankr. D. Del. Aug. 12, 2008); *In re ACG Holdings, Inc.*, Case No. 08-11467 (CSS) (Bankr. D. Del. Aug. 11, 2008); *In re Portola Packaging, Inc.*, Case No. 08-12001 (CSS) (Bankr. D. Del. Sept. 19, 2008); *In re Hines Horticultural, Inc.*, Case No. 08-11922 (KJC) (Bankr. D. Del. Sept. 9, 2008); *In re Tropicana Entertainment, LLC*, Case No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008).

40. The Debtor represents that (a) the retention of the OCPs is necessary for the day-to-day operations of the Debtor's business; (b) expenses for the OCPs will be monitored; and (c) the OCPs will not perform substantial bankruptcy-related services without filing an application with this Court for separate retention as a non-ordinary course professional.

41. Although some of the OCPs may hold minor amounts of unsecured claims against the Debtor in respect of prepetition services rendered, the Debtor does not believe that any of the OCPs have an interest materially adverse to the Debtor, their creditors, or other parties in

interest.  By this Motion, the Debtor is not requesting authority to pay prepetition amounts owed to any OCPs.

42.	Furthermore, each OCP will file an affidavit of disinterestedness in accordance with the OCP Procedures.

43.	Pursuant to the Bankruptcy Rule 6003, the court may grant relief regarding an application pursuant to Bankruptcy Rule 2014 to retain a professional within twenty days after the filing of the petition to the extent the relief is necessary to avoid immediate and irreparable harm.

44.	To the extent Bankruptcy Rule 6003 is applicable to the retention of OCPs, the Debtor respectfully submits that failure to authorize the Debtor to retain the OCPs within the first twenty days of this case would cause immediate and irreparable harm.  If the Debtor is to minimize any disruption to its business operations as a result of this Chapter 11 Case, it must be able to avail itself of the services of its OCPs.  These OCPs are critical to the Debtor's key work streams, especially during this period.

45.	Further, the Debtor submits that immediate approval of the relief requested herein will not prejudice any of parties in the Chapter 11 Case.  Pursuant to the OCP Procedures, each of the OCPs is required to submit a declaration of disinterestedness.  All parties-in-interest then have three business days to object to the OCP's retention in these cases.  Thereafter, all parties-in-interest, including the Office of the United States Trustee retain the right to further examine the appropriateness of the retention of each individual OCP.

46.	Accordingly, the Debtor submits that it has satisfied the requirements of Bankruptcy Rules 6003 to support immediate entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtor to retain and employ the OCPs.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

47. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

48. The Debtor will serve notice of this Motion on the Notice Parties identified on the Debtor's Motion to Establish Notice Procedures, Exhibit B.

## NO PRIOR REQUEST

49. No prior request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtor to retain and compensate OCPs in accordance with the OCP Procedures and (b) granting such other and further relief as is just and proper.

Dated: September 15, 2009

**GODFREY & KAHN, S.C.**

/s/ *Carla O. Andres*
Timothy F. Nixon (WI Bar No. 1013753)
Carla O. Andres (WI Bar No. 1020997)

*Proposed Attorneys for the Debtor*

Timothy F. Nixon
Carla O. Andres
GODFREY & KAHN, S.C.
780 North Water Street
Milwaukee, Wisconsin 53202
Tel: (414) 273-3500
Fax: (414) 273-5198
E-mail: tnixon@gklaw.com
candres@gklaw.com